IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| MARY FOSTER, | ) | Case No. 09 B 15591 |
| | ) | |
| Debtor. | ) | Honorable Jacqueline P. Cox |
| | ) | |
| NLT TITLE, LLC, | ) | |
| A SUBSIDIARY OF | ) | |
| ATTORNEY'S TITLE | ) | |
| GUARANTY FUND, INC. | ) | |
| | ) | Adv. No. 09 A 00480 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARY FOSTER | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

In this adversary proceeding, plaintiff NLT Title, LLC ("NLT") alleges that the debtor, Mary Foster ("Foster"), obtained $18,606.92 from NLT by means of actual fraud. NLT seeks an order holding that Foster's alleged debt be excepted from her bankruptcy discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

### Jurisdiction

The Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This matter is a core proceeding under 28 U.S.C. §§ 157(b)(I).

## Background

As part of its business operations, NLT conducts closings for the sales of real property. On September 27, 2006, NLT performed the closing for the sale of Foster's property located at 219 North Vale Avenue, Rockford, Illinois. Foster's share of the sale proceeds was $18,606.92, which NLT attempted to pay to her by check number 14131 ("Check No. 14131"), drawn on NLT's account at Northwest Bank. The memo line of the check, however, read "Check #14133." This created a discrepancy between the pre-printed number on the top of the check and the number printed by NLT on the memo line.

While Foster was not present at trial to testify as to what happened next,[1] Sheila Roportella, an employee of NLT who had signed Check No. 14131, testified that it was her understanding that Foster returned to NLT's offices on September 27 (or within two days thereafter), claiming that she had been unable to cash the check. Mary Kasper, a Vice-President at Northwest Bank, testified that, while she did not know whether Foster actually attempted to cash Check No. 14131 or whether Northwest Bank refused to honor the check, the discrepancy between the numbers on the check could have caused a bank employee to refuse to honor it. Kasper further stated that the decision to honor a check with such discrepancies falls within the discretion of individual bank employees, meaning that a different bank employee might have decided to honor Check No. 14131.

NLT issued a second check, numbered 14146 ("Check No. 14146"), to Foster, in the amount of $18,606.92. Roportella testified that it was NLT's practice not to reissue checks without either recovering or stopping payment on the original check. Nevertheless, NLT did not

---

[1] At the outset of trial, Foster's counsel stated that his client's car had been repossessed recently and, as a result, she was unable to travel to court. Foster's counsel requested that the trial be continued to another date. The Court denied this request because Foster lives in Arlington Heights, which is a suburb of Chicago and is serviced by Chicago's public transportation system, and thus Foster could have attended the hearing if she had made even minimal efforts to do so.

2

stop payment on Check No. 14131, nor did it require Foster to return Check No. 14131. Heather Manus, another employee of NLT, signed the second check. Manus did not testify at trial and therefore it is unknown exactly what statements, if any, Foster made in connection with obtaining the second check or why Manus did not require Foster to return the first check. Subsequently, in Fall 2006, Manus was dismissed from her job with NLT for general performance reasons.

Foster cashed Check No. 14146 on September 29, 2006. Foster thus received the full amount of the sale proceeds due to her from NLT.

On January 6, 2007, Foster filed a report with the Hanover Park Police Department, stating that her wallet had been stolen. According to the report, Foster last saw her wallet at approximately 1:30 a.m. on January 7 when presenting her identification to the doorman at Choices Nightclub in Bellwood, Illinois. Foster reported that her wallet contained, among other things, her Illinois driver's license and "a check made out to her from a bank in Rockford IL for $18,000 which she received for a house sale" – *i.e.*, Check No. 14131.

On January 8, 2007, Check No. 14131 was cashed at a branch of Northwest Bank. When honoring checks in an amount greater than $10,000, Northwest Bank requires its employees to request photo identification from the customer, to make a visual match between the photo and the customer's appearance, and to retain a photocopy of the identification. Northwest Bank's records indicate that the person who cashed Check No. 14131 presented Foster's driver's license. Furthermore, the signature endorsing Check No. 14131 read "Mary Foster" and appeared to be identical to Foster's signature endorsing Check No. 14146.

NLT subsequently discovered that both Check Nos. 14131 and 14146 had been cashed and, though it is unclear from the record, apparently commenced an action in state court against

3

Foster, alleging that she had cashed both checks and therefore fraudulently obtained $18,606.92 from NLT.

Foster filed for chapter 7 bankruptcy relief on May 10, 2009. On June 15, 2009, NLT filed a two-count adversary complaint against Foster. Count I seeks a determination that Foster obtained $18,606.92 by defrauding NLT and that such debt is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). Count II requests all fees and costs incurred by NLT in prosecuting the adversary complaint and its related state court action.

The parties do not dispute that Foster received Check No. 14131 from NLT on September 27, 2006, that she returned to NLT's offices complaining that Northwest Bank refused to honor Check No. 14131, that NLT then issued Check No. 14146 to Foster, or that Foster cashed Check No. 14146 shortly thereafter. NLT contends that Foster also cashed Check No. 14131 in January 2007, as evidenced by the signature endorsing the check and the fact that the customer who cashed the check presented Foster's driver's license. Foster responds by claiming that she lost her wallet – which contained her driver's license and Check No. 14131 – in January 2007, and that the person who found her wallet must have impersonated her at the bank and cashed the check. Foster, through her counsel, further explains that Check No. 14131 bore her signature because she attempted to cash it in September 2006, but was rebuffed by Northwest Bank.

## Discussion

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. . . ." The party opposing discharge

4

bears the burden of proving by a preponderance of the evidence that the debt falls within the ambit of Section 523(a)(2). *Grogan v. Garner*, 498 U.S. 279, 290 (1991)

To prevail under this provision, a plaintiff typically must prove that (i) the debtor made a false statement which she knew to be false, or which was made with such reckless disregard for the truth as to constitute a willful misrepresentation; (ii) the debtor had the intent to deceive; and (iii) to its detriment, the plaintiff justifiably relied on the debtor's misrepresentation. *Mayer v. Spanel*, 51 F.3d 670, 673-74 (7th Cir. 1995); *Massachusetts Casualty Ins. Co. v. Green (In re Green)*, 241 B.R. 550, 564 (Bankr. N.D. Ill. 1999).

Under this standard, NLT could not prevail because Foster did not obtain either check as the result of any misrepresentations that NLT relied upon. Foster was entitled to receive $18,606.92 from the sale of her property and NLT attempted to pay her this amount by issuing Check No. 14131. Thus, there were no misrepresentations that enabled Foster to receive this check.

Foster apparently returned to NLT's offices complaining that Northwest Bank refused to honor the first check. As discussed above, Mary Kasper, NLT's witness, testified that the discrepancy between the pre-printed check number at the top of Check No. 14131 and the number printed by NLT on the memo line could have caused a Northwest Bank employee to refuse to honor the check. NLT does not dispute that Foster attempted to cash Check No. 14131, nor that her attempt was rebuffed. Thus, the only reasonable conclusion is that Foster did, in fact, attempt to cash Check No. 14131 and that Northwest Bank refused to honor it because of the error on the memo line. Accordingly, when NLT issued Check No. 14146 to Foster, it did so not based on any misrepresentations, but based rather on Foster's truthful statement that she had been unable to cash Check No. 14131.

While the parties' arguments were primarily focused on whether Foster made any misrepresentations, the Seventh Circuit made it clear in *McClellan v. Cantrell*, 217 F.3d 890 (7th Cir. 2000), that misrepresentation and reliance are not always required to establish "actual fraud." In *McClellan*, the Seventh Circuit stated:

> No learned inquiry into the history of fraud is necessary to establish that it is not limited to misrepresentations and misleading omissions. "Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated."

217 F.3d at 893 (quoting *Stapleton v. Holt*, 250 P.2d 451, 453-54, 207 Okla. 443 (Okla. 1952)).

When "non-representational fraud is alleged, a different analysis must be employed to assess the sufficiency of the plaintiff's allegations." *Hellenic Enter. I, Inc. v. Vitogiannis (In re Vitogiannis)*, 2009 WL 1372065, at *8 (Bankr. N.D. Ill. May 15, 2009). Under this analysis, NLT must demonstrate that (i) a fraud occurred, (ii) Foster acted with intent to defraud, and (iii) the fraud created the debt at issue. *Id.*

Assuming that Foster cashed Check No. 14131 in January 2007, the latter two elements are easily satisfied. First, having already received $18,606.92 from NLT by cashing Check No. 14146, Foster would unquestionably know that she was not entitled to any more funds from the sale of her property, and therefore the Court can infer that she intended to defraud NLT by cashing Check No. 14131. *See Rezin v. Barr (In re Barr)*, 194 B.R. 1009, 1020 (Bankr. N.D. Ill. 1996) (fraudulent intent may be inferred from the surrounding circumstances). Second, Foster's debt to NLT would arise solely as a result of cashing Check No. 14131 and obtaining funds to which she had no right.

Thus, the sole question is whether Foster committed a fraud. As stated in *McClellan*, a fraud can be "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." *McClellan*, 217 F.3d at 893 (quoting 4 COLLIER ON BANKRUPTCY ¶ 523.08[1][e], p. 523-45 (15th ed., Lawrence P. King ed., 2000)). If Foster knowingly retained Check No. 14131 for more than three months despite having already received all the money she was owed, concocted a story about her wallet being stolen, and then cashed the check to obtain funds to which she was not entitled, this deceitful behavior and attempt to cheat NLT would certainly qualify as fraud under *McClellan*'s definition.

The evidence offered at trial supports the conclusion that Foster committed fraud when she cashed Check No. 14131 in January 2007. As noted above, the person who cashed Check No. 14131 presented Foster's driver's license to a Northwest Bank employee, who made a photocopy of the license and saved it in the bank's records. Additionally, the bank's standard practice required its employee to match the picture and signature on Foster's license with the appearance and signature of the person presenting the check, and there is no evidence that the bank failed to comply with this practice. Furthermore, Kasper testified that she had no reason to believe that anyone other than Foster cashed the check. Finally, the Court finds Foster's story – made through her counsel – regarding the loss of her wallet to be highly suspicious. In particular, as evidenced by the police report in which she reported that Check No. 14131 had been in her wallet, Foster was well aware that she still had possession of the check. Thus, Foster would have the Court believe that for more than three months, she knowingly continued to carry a fully endorsed check worth more than $18,000 in her wallet, even though she did not cash it. In the absence of any testimony from Foster explaining this behavior, the Court concludes that

7

Foster intended to cash the check at some point and that she lied about losing the check in January 2007 to cover up her planned theft of NLT's funds.

In sum, although NLT failed to identify any misrepresentations, it has met its burden to establish by a preponderance of the evidence that Foster incurred a debt of $18,606.92 by means of actual fraud, and that such debt is non-dischargeable under 11 U.S.C. § 523(a)(2)(A). Because damages arising from fraudulent acts are non-dischargeable, *Cohen v. Cruz*, 523 U.S. 213(1998), the Court also holds that all state court costs and service of process fees due and owing to NLT are also held to be non-dischargeable.

## Conclusion

For the reasons stated above, the Court finds in favor of the plaintiff NLT on Counts I and II of the adversary complaint and holds that Foster's debt to NLT of $18,606.92 is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). Additionally, as requested in Count II of the complaint, all state court costs and service of process fees due and owing to NLT are held to be non-dischargeable.

**DATE: September 30, 2009**

ENTER:

*Jacqueline P. Cox*

**Jacqueline P. Cox**
**United States Bankruptcy Judge**